## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.

**SUPERFAST GMBH,**

      Plaintiff,

v.

**SCOTT OLIVER; SCOTT OLIVER LAW LLC; AND JOHN DOES 1-10**

      Defendants.

---

### COMPLAINT AND JURY DEMAND

---

Plaintiff Superfast GmbH ("Superfast"), by and through its undersigned counsel, IRELAND STAPLETON PRYOR & PASCOE, PC, files its Complaint against Defendants Scott Oliver ("Oliver"), Scott Oliver Law LLC ("Oliver Law", and with Oliver, the "Oliver Defendants"), and John Does 1-10, stating as follows:

### NATURE OF THE CASE

1.    Defendant Oliver, through his law firm, Oliver Law, is running a multi-million-dollar scam involving the fraudulent sale of "build slots" for exotic cars. Plaintiff Superfast is one of the recent victims of this scam, which has been ongoing for several years.

2.    The scam generally works as follows: Oliver and his co-conspirators connect with car collectors and tout that Oliver Law can broker the sale of a build-slot for highly sought-after supercars. A build slot is essentially a spot in line to purchase a limited-production car from the

manufacturer at its suggested retail price ("MSRP")—in this case, two Ferrari 812 Competizione Apertas (the "Ferrari 812(s)"). Because so few of these cars are built, car collectors are willing to pay a significant premium above MSRP to acquire a build slot because their market value exceeds the MSRP.

3.     Oliver then provides false documentation for the seller and their right to the build slot. Purporting to represent the seller, Oliver creates and then requires the buyer to sign an "agreement" to purchase the build slot, which necessitates advance payment of hundreds of thousands or millions of dollars to Oliver's law firm trust account prior to the car being delivered. However, as Oliver knows, the seller and build slot are completely fictitious and the car is never delivered.

4.     In this case, Oliver—through Oliver Law—brokered the sale of a build slot for a Ferrari 812 from two different purported sellers—one allegedly in Hong Kong and one in Japan. In spring of 2023, the Oliver Defendants prepared sales contracts and provided fabricated "documentation" of the build slots from Ferrari dealers, which they sent to Superfast's representatives. After Superfast wired a total of €1,956,370 (~$2.1 million) to Oliver Law's trust account, the Ferraris never materialized because neither they nor the sellers exist. The Oliver Defendants have refused to return Superfast's €1.9 million and instead, upon information and belief, Oliver pocketed the proceeds and/or has funneled those proceeds to unidentified co-conspirators who served as the fictitious sellers.

5.     Superfast has recently learned that Oliver has used the purported legitimacy of his law firm, Oliver Law, to orchestrate nearly identical build-slot scams with multiple different victims since at least 2021. For instance, the Oliver Defendants are currently being sued in federal

6112471.2

district court in connection with the fraudulent sale of a Mercedes-Benz AMG One build slot for $5,417,976.54.  *See* **Exhibit 1**, Complaint, *Michael Mente v. Scott Oliver et al.*, No. 1:25-cv-00525 (D. Colo.) ("Mente Complaint").

6.     Separately, an unsealed federal search warrant application filed in the Southern District of Indiana (and signed under oath by a federal special agent) details the Oliver Defendants' role in working alongside a known con-artist to defraud multiple other victims using the same build-slot scam.  *See* **Exhibit 2** ("Warrant Affidavit").

7.     Notably, Oliver embarked on his scam with Superfast **_after_** defrauding multiple other victims and **_after_** he was already under federal investigation.

8.     Superfast sues the Oliver Defendants for fraud, civil theft, violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), violations of the Colorado Organized Crime Control Act ("COCCA"), negligent misrepresentation, and unjust enrichment. Superfast also names the Oliver Defendants' unidentified co-conspirators, if any, as John Does 1-10.  Superfast reserves the right to name these individuals if and when they are identified through discovery.

9.     Superfast also seeks injunctive relief that, among other things, freezes Oliver's assets and any assets under his control and requires him to immediately account for Superfast's funds that were purportedly wired to Oliver Law's COLTAF account.

## PARTIES, JURISDICTION, AND VENUE

10.     Plaintiff Superfast GmbH is a Liechtenstein limited liability company with its principal place of business at Industriering 3, 9491 Ruggell, Liechtenstein.  No member of Superfast is, has been, or intends to be a citizen of the State of Colorado.

6112471.2

11.     Upon information and belief, Defendant Oliver is an individual residing in Boulder County at 8280 Deer Run, Longmont, Colorado 80503.  Upon information and belief, Oliver committed acts, errors, and omissions as alleged herein in his professional capacity with Oliver Law.

12.     Defendant Oliver Law is a Colorado limited liability company with its principal place of business at 1729 Terry St, Longmont, CO 80501, which is in Boulder County.  Defendant Oliver organized Oliver Law in 2011 and is the firm's registered agent.  **Exhibit 3**, Articles of Organization.  Defendant Oliver holds himself out as owning and managing Oliver Law.  *See* https://scottoliverlaw.com/about-scott-oliver/.

13.     Defendant John Does 1-10 are yet-to-be identified individuals or entities who may serve as the Oliver Defendants' fictitious sellers to perpetuate the fraudulent scheme.  Upon information and belief, the con artist who served as the fictitious seller in the Mente scheme, Traveon Rogers, had already been imprisoned by the time Oliver conducted the same fraudulent scheme against Superfast.

14.     This Court has subject matter jurisdiction over Plaintiff's RICO claim under 28 U.S.C. § 1331 and 18 U.S.C § 1964. This Court further has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and cost, and is between citizens of different states.

15.     Even absent diversity jurisdiction, supplemental jurisdiction over Superfast's state law claims is proper under 28 U.S.C. § 1367(a).

16.     This Court has personal jurisdiction over the Defendants because they are citizens of Colorado and pursuant to Colo. Rev. Stat. § 13-1-124 as the Defendants, directly or through their agents, have transacted business and/or committed a tortious act within the State of Colorado.

17.     Venue is proper in this Court pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391.

## GENERAL ALLEGATIONS

### Superfast Is Introduced to Oliver as a Purported Broker for Ferrari 812 Build Slots

18.     Superfast is owned by a European car enthusiast who utilizes the company to invest in the collection of exotic cars.

19.     In early 2023, an exotic car broker in Europe, Marcus Korbach, was made aware of the potential to purchase two limited-production Ferrari 812 supercar build slots through an industry contact named Claudio Tribolo.

20.     Korbach was aware that Superfast may be interested in purchasing the build slots and confirmed that with Superfast.

21.     After confirming Superfast's interest, Tribolo advised Korbach that the transaction would be handled by an attorney from the United States named Scott Oliver.  Because there were language barriers, Korbach agreed to act as Superfast's intermediary.

22.     Korbach, Oliver, and Tribolo then began communicating electronically through WhatsApp, which is a private, encrypted communication platform that allows for text and voice messaging.  Nearly all of the Oliver Defendants' fraudulent communications, including fabricated documentation of the sellers and of the existence of the Ferrari 812s, was sent by Oliver via this WhatsApp message thread.

23.     Oliver represented in multiple communications between February and March 2023 that he frequently brokered build-slot sales on behalf of sellers across the globe.

24.     To explore the potential sale, Korbach and Superfast separately entered into Confidentiality and Non-Disclosure Agreements with Oliver Law dated effective February 13, 2023 and February 14, 2023, respectively ("NDA(s)").  *See* **Exhibit 4**, Korbach NDA.

25.     The NDAs provide that Superfast is "interested in purchasing the Ferrari [812] build slot (the "Build Slot") through the services of [Oliver Law]."

26.     The purpose of the NDAs was to protect the purported sensitive information of the build-slot sellers.  The Oliver Defendants represented that the fictitious sellers were VIP Ferrari customers, who, through their relationship with a Ferrari dealer, had the ability to purchase a limited-production Ferrari 812 from the dealer.

27.     The Oliver Defendants further represented that confidentiality around the build-slot transaction was critical because any disclosure of the sale could result in the sellers losing their VIP status since Ferrari does not permit its VIP customers to sell their build slots.

28.     This contrived shroud of secrecy was an essential aspect of the scheme, which the Oliver Defendants would later wield to prevent Superfast and its representatives from pursuing their suspicions about the legitimacy of the transactions.

**<u>Superfast Wires Oliver Law More Than €1.5 Million Based on Fabricated Documentation</u>**

29.     In mid-February 2023, Oliver began sharing information related to the purported sellers of the build slots to induce Superfast to wire Oliver funds to purchase the purported build-slots. Oliver provided this information with the admonishment that Korbach and Superfast not reveal the sellers' "sensitive information" regarding their build slots:

```
[20.02.23, 10:44:23] ~ Scott Oliver: Marcus, if you have confidence
in your buyer not to share sensitive information, I can provide the
seller detail and invoices now.  It would need to be on the contract
in order for your client to sign.
```

**Exhibit 5**, WhatsApp message excerpts, p. 1.

30.    This playbook ensured that Korbach and Superfast would not reach out to Ferrari

directly to confirm the authenticity of the documentation provided by Oliver.

31.    Oliver then sent Korbach information for two different sellers, the first allegedly

being a Hanamichi Fukoda from Tokyo, Japan and the second a Jahy Chang from Hong Kong.

32.    The purported documentation provided by Oliver via WhatsApp included copies of

the sellers' passports and purported web page screen shots regarding details of the sellers' alleged

Ferrari 812 build slots.

```
[21.02.23, 10:25:00] ~ Scott Oliver: Good afternoon Marcus.  I have
the passport and Ferrari webpage screen shot for both Mr. Chen and
Mr. Hanamichi.  I can add the address for each to the contract.
```

Ex. 5, p. 2.

33.    When an issue arose with respect to the name of the Hong Kong seller, Oliver

expressly represented that he had "verified" Mr. Chang (as opposed to Chen).

```
[21.02.23, 16:35:51] ~ Scott Oliver: Marcus, everything is good.
Claudio presented some information that I hadn't seen before, but
I've Re verified Mr. Chang.
```

Ex. 5, p. 3.

34.    The documentation provided by Oliver, including the identifying information for

the sellers and the information regarding the Ferrari 812 build slots was fabricated because

Superfast has since learned that no Ferrari purchase orders exist on behalf of these purported

sellers, who appear to be fictitious.

35.     As detailed in the Mente Complaint and Warrant Affidavit, the Oliver Defendants previously had a direct and knowing role in orchestrating the same build-slot scam using fictitious sellers and fictitious exotic cars, and consequently the Oliver Defendants knew the information provided by Oliver was fabricated or, at a minimum, had a reckless disregard for its truth or falsity.

36.     Based on the representations made by Oliver regarding the sellers and the build slots, Superfast executed a Sale and Purchase Agreement with the fictitious Hanamichi Fukoda dated March 1, 2023 for the purported purchase of a Ferrari 812 Competitzione Aperta ("Aperta Agreement").  *See* **Exhibit 6**.[1]

37.     Separately, Superfast executed a Sale and Purchase Agreement with the fictitious Jahy Change dated March 1, 2023 for the purported purchase of a Ferrari 812 Competizione Coupe ("Coupe Agreement", with the Aperta Agreement, the "Agreements").  *See* **Exhibit 7**.

38.     The agreements mirror one another, and required Superfast to wire to Oliver Law's attorney trust account the "premium" above MSRP in the amount €601,000.00, an initial deposit of €150,000.00, and then later pay each vehicle's MSRP of €655,000.00 and €555,000.00, respectively (less the initial deposit) upon delivery.  Exs. 6 and 7, §§ 3.1 and 3.2.

39.     The premium and initial deposit ("Closing Payment") were due upon execution of the Agreements and had to be made to the "Legal Trust account" for Oliver Law.  *See* Exs. 6 and 7, § 3.3.

40.     After payment of the Closing Payments, the sellers would purportedly configure the Ferrari 812s using the options selected by Superfast.  Exs. 6 and 7, § 3.4.

---

[1] "Aperta" means "open" in Italian and refers to the convertible version of the vehicle.

41.     The Ferrari 812s were then to be built by Ferrari and delivered to sellers at the location selected by Superfast, with sellers holding title to the vehicles for a six-month restricted transfer period required by Ferrari.  Delivery of the Ferrari 812s was to occur 6 to 9 months after configuration.  Exs. 6 and 7, §§ 3.5 and 3.6.

42.     This playbook—requiring hefty initial payments with delivery not to take place until several months later—allowed the Oliver Defendants and their unidentified co-conspirators to abscond with Superfast's funds and funnel them in a way that may make them difficult to trace.

43.     The Agreements also re-stated the "confidentiality" requirement so as to prevent Superfast from taking steps to authenticate the deal with Ferrari directly.  Exs. 6 and 7, §§ 9.1 and 9.2.

44.     On March 1, 2023, Oliver sent a copy of wiring instructions that were purportedly for Oliver Law's COLTAF account and a copy of his passport.  *See* **Exhibit 8**.

45.     In reliance on the Oliver Defendants' representations regarding the legitimacy of the sellers and the Ferrari 812s, Superfast sent two separate wires to Oliver Law, each in the amount of €751,000.00, on March 13, 2023.  *See* **Exhibit 9**.

**Superfast Wires More Funds to Oliver Law Based on Additional Fabricated Documentation**

46.     Ten days after Superfast wired Oliver Law €1,502,000.00, Oliver represented to Korbach via WhatsApp that the sellers had made a second payment to Ferrari that Superfast needed to "pay right away" to make sure that Ferrari would move forward with building the cars as configured by Superfast:

```
[20.03.23, 13:00:44] ~ Scott Oliver: Good afternoon.  I have
received confirmation that both payments have been received and the
orders are locked with Ferrari.
Sellers have already paid the 2nd invoice on behalf of the buyers,
so that everything is timely and the slot configuration has been
accepted by Ferrari.  This 2nd invoice will need to be paid by the
Buyers right away.  I will send them over.
```

Ex. 5, p. 4.

47.     These representations were false because the sellers had not made any such payments to Ferrari.

48.     Nevertheless, using WhatsApp, Oliver sent copies of purported invoices from Ferrari to the sellers and receipts of alleged payments made by the sellers to Ferrari and demanding payment "right away".  Ex. 5, p. 4. Copies of the invoices and receipts are attached as **Exhibit 10**.

49.     Upon information and belief, the invoices are fabricated because, to Superfast's knowledge, no such orders for the Ferrari 812s exist on behalf of the purported sellers.

50.     When Korbach asked for additional documentation of the car configuration and orders "within the Ferrari system", Oliver represented:

```
[20.03.23, 14:13:28] ~ Scott Oliver: It isn't in the ferrari system
yet.  Nothing will show up online until the slot moves to
production, which will be in 1–2 months.
```

Ex. 5, p. 5.

51.     This representation was also false and intentionally made to prevent Superfast from doing additional investigation into the transaction prior to wiring the additional funds.

52.     To placate Korbach, on March 23, 2023, Oliver sent an "Options List" for both Ferrari 812s via WhatsApp that purportedly reflected the build configurations selected by Superfast.  **Exhibit 11**.  Again, on information and belief, these documents were fabricated by Oliver and/or his co-conspirators.

53.     After sending the fabricated option lists, Oliver stated that Korbach had "everything you need" for Superfast to make the second round of payments, and he demanded that Korbach "arrange for payment [from Superfast] . . .  right away."  Ex. 5, p. 10.

54.     When Superfast delayed making the second round of payments, Oliver sent two demand letters directed to Superfast via WhatsApp on March 29, 2023.  The letters were sent on Oliver Law's letterhead and stated that Superfast was in breach of the Agreements by not wiring the additional funds to Oliver Law.  Oliver Law threatened that, unless the additional funds were wired, the deal would be terminated with all prior payments kept as "liquidated damages", even though Superfast had already wired Oliver Law more than €1.5 million.  *See* **Exhibit 12**.

55.     In reliance on the additional false documentation sent by Oliver and in the face of the threat to kill the deal and keep Superfast's money, Superfast made two additional wire payments to Oliver Law's trust account on April 3, 2023, in the amounts of €201,000.00 and €230,370.00, respectively.

56.     While all wires were purportedly made to Oliver Law's trust account, payments were sent to an "IFX Payments" bank account with an overseas London, England address.  *See* Ex. 8, wire instructions.

**Superfast Ultimately Discovers the Fraud and Oliver Refuses to Return Its Funds**

57.     On June 23, 2023, Korbach followed up with Oliver on the status of the Ferrari 812s and for documentation that the sellers' orders were in Ferrari's internal systems.

58.     Oliver responded by falsely blaming Ferrari for being non-transparent with orders for its own customers:

```
[21.06.23, 10:53:51] ~ Scott Oliver: Ferrari is notoriously slow
informing their clients of the vehicle status.  We had a vehicle
deliver recently, and the owner only found out because he went to
his dealership for a different reason, and saw his car being
unloaded!  No notice at all, not even that the vehicle was being
manufactured.  I continue to ask our sellers for updates, and they
will provide anything they receive.
```

Ex. 5, p. 6.

59.     After Korbach pressed Oliver to provide Ferrari order numbers for the Ferrari 812s,

Oliver insisted the Ferrari would not provide an order number at this stage, which was allegedly

Ferrari's typical practice.  *See* Ex. 5, p. 6.

60.     In July of 2023, when Oliver had still not sent Ferrari order numbers or other

confirming information, Superfast, through Korbach, indicated it was going to inquire directly with

a European Ferrari dealer on the status of the purported orders.

61.     Oliver again threatened Superfast:

```
Second, if he goes to the Ferrari dealer he won't be able to find
out anything, and risks exposing the deal and losing the build slot.
if this happens, he loses the money he has paid to date, and the VIP
loses his status.  You must instruct him not to do this in any way.
I will check with the VIP for an update as to delivery.
```

Ex. 5, p. 7.

62.     In reliance on Oliver's misrepresentations and threats, Superfast delayed going to

Ferrari directly to confirm the legitimacy of the transaction, just as Oliver intended.

63.     As Korbach continued to push for information, Oliver began to become

nonresponsive through August and September of 2023.

64.     In mid-September, Oliver finally responded that Ferrari was delayed in its

productions of "V12s" (the type of motor in the Ferrari 812s) and thus "all deliveries have been

pushed back to Q4 [2023]", and that none of his VIPs were getting any direct updates from Ferrari on these delays.  Ex. 5, p. 8.  These representations were false.

66. Again, Oliver intended for Superfast to rely on these false representations in not pursuing the legitimacy of the transactions.

66. On September 10, 2023, Korbach responded that the European Ferrari dealer that was supposed to take delivery of the Ferrari 812s had confirmed they had no record of these cars being in any delivery pipeline.  Ex. 5, p. 9.

67. After a month went by with no further communication from Oliver, Korbach sent Oliver a message on October 10, 2023, demanding proof of the orders with Ferrari and advising Oliver that Superfast was ready to "take this to the police and lawyers." Ex. 5, p. 9.

68. Oliver inadvertently responded in the WhatsApp chain with a message directed to one of his unidentified co-conspirators:

> [10.10.23, 09:35:58] ~ Scott Oliver: This is from a Broker, Marcus, who was part of the sale of a Coupe and Aperta to a company called Superfast.  This is going to be a problem.

Ex. 5, p. 9.

69. Obviously, if the sales had ever been legitimate, it would not be a "problem" for Oliver for Superfast to go to the authorities.

70. By this time—and unbeknownst to Superfast—other victims of Oliver's fraudulent scheme and federal authorities had long-since been in pursuit of Oliver.

71. Since October of 2023, Oliver has continued to provide thin explanations regarding the delay in delivering the Ferrari 812s and continued to make bogus threats about

"confidentiality," all without providing any substantive documentation directly from Ferrari that the cars exist.

72.     Superfast has since been able to independently confirm that no such orders for the Ferrari 812s exist.  Superfast has also since learned of Oliver's direct involvement in multiple build-slot scams involving millions of dollars in absconded funds.

73.     In April of this year, Superfast demanded that the Oliver Defendants return the €1,956,370.00 wired to Oliver Law's trust account or, if the funds, were transferred elsewhere, for an accounting of any such transfers, including the recipients.

74.     The Oliver Defendants refused to do either and instead again threatened Superfast with confidentiality violations under the bogus Agreements.  As far as Superfast knows, Oliver has simply absconded with Superfast's funds or funneled them to his co-conspirators.

75.     Given the number of victims and the criminal and international nature of the Oliver Defendants' build-slot scheme, there is an immediate and real risk that Oliver has or will funnel the proceeds of the scheme and other assets outside of the bounds of this Court's jurisdiction.

## FIRST CLAIM FOR RELIEF
### (Fraudulent Misrepresentation and Nondisclosure against the Oliver Defendants)

76.     Superfast incorporates all foregoing allegations as if set forth fully herein.

77.     As outlined in detail above, Oliver, individually and on behalf of Oliver Law, falsely represented, among other things, that: (a) Oliver Law represented the sellers of the Ferrari 812s; (b) sellers were the individuals identified by Oliver; (c) Oliver had "verified" the seller(s); (d) the sellers were VIP Ferrari customers who had rights to the build slots for the Ferrari 812s; (e) the sellers would configure and order the Ferrari 812s and deliver them to Superfast; (f) the sellers had, in fact, configured and ordered the Ferrari 812s; (g) the sellers had paid invoiced sums to

14

Ferrari; (h) no documentation of the transaction was available due to lack of transparency on Ferrari's part; (i) the sellers would lose their VIP status of Superfast sought to confirm the legitimacy of the transactions with Ferrari; and (j) the delivery of the Ferrari 812s was delayed by the manufacturer.

78.     Given Oliver's prior and ongoing direct role in other build-slot scams, Oliver made these misrepresentations with actual knowledge of their falsity, with reckless ignorance of their truth or falsity, and/or with no knowledge of their truth or falsity.  For example, the Warrant Affidavit details at length Oliver's 2021 role in assisting convicted con-artist Traveon Rogers in defrauding multiple victims, even after Oliver was personally put on notice of Traveon Rogers being a "fraud."  Ex. 2, Warrant Aff., pp. 15-16, ¶¶ 47-53.

79.     The false representations outlined above were made by Oliver to Superfast's broker, Korbach, in writing or by telephone via WhatsApp on the dates outlined above and in the attached WhatsApp transcript.  Upon information and belief, at the time of these communications, Oliver was in Colorado while Korbach and Tribolo were in Europe or traveling elsewhere across the globe.

80.     In making these communications, Oliver concealed and failed to disclose, among other things, his prior involvement in nearly identical build-slot scams, the true identity of his "seller" co-conspirators, and the true status of the purported Ferrari 812 orders (i.e., the lack of any such orders existing).

81.     The misrepresented and omitted facts were material to Superfast's decision to enter into the bogus Agreements, to send multiple wire transfers to Oliver Law totaling €1,956,370.00, and/or to not investigate the legitimacy of the transactions and pursue the absconded funds sooner.

82.     The Oliver Defendants made these material misrepresentations and concealed or failed to disclose these facts with the intent that Superfast rely on them in moving forward with the transactions, wiring funds to Oliver Law to purchase the fictitious Ferrari 812s, and not investigating the legitimacy of the transactions.

83.     Superfast did, in fact, rely on these representations and its belief that the concealed and/or undisclosed information did not exist or was different than it actually was.

84.     Superfast's reliance on the misrepresentations and omissions was justified given the sophistication with which the Oliver Defendants have honed their fraudulent scheme.

85.     Superfast's reliance caused injury and damages to Superfast in an amount to be determined at trial.

### SECOND CLAIM FOR RELIEF
**(18 U.S.C. 1962(c) RICO Violation Against Oliver)**

86.     Superfast incorporates all foregoing allegations as if set forth fully herein.

87.     Oliver, as an individual, is a "person" within the meaning of RICO.

88.     Oliver operates a law firm, Oliver Law, as a RICO enterprise.  As outlined above, Oliver Law is a distinct legal entity through which Oliver orchestrates his build-slot schemes. Oliver operates Oliver Law as a guise to lend legitimacy to otherwise fraudulent transactions and to shield the fact that purported "sellers" of the build slots are fictitious.

89.     For example, in this case, the *Mente* case, and with the victims discussed in the Warrant Affidavit, Oliver used Oliver Law's COLTAF account to route stolen funds.  Ex. 1, Mente Compl., p. 5, ¶¶ 27-28; Ex. 2, Warrant Aff., p. 15, ¶¶ 25, 50-53, 65 (identifying "SCOTT OLIVER LAW COLTAF" as the account from which stolen funds were sent and received).

6112471.2

90.     As further outlined in the Warrant Affidavit, Oliver used the law firm in other ways to perpetuate the same scheme on multiple victims, including preparing letters of intent on firm letterhead (Ex. 1, p. 13, ¶ 40) and using his law firm email account to send fraudulent documents and agreements (Ex. 2, p. 14, ¶ 46).

91.     In this case, Oliver Law was the party to the NDAs that were the precursor to the bogus Agreements.  Ex. 4.  Oliver also used the apparent legitimacy of his law firm to make monetary demands for alleged breaches of the bogus Agreements, which ultimately resulted in Superfast wiring another €431,370 to Oliver Law's trust account.  Ex. 12.

92.     Upon information and belief, Oliver may be working as part of a larger associated-in-fact enterprise involving other con artists (such as Traveon Rogers).  Superfast reserves its right to amend its Complaint if such facts are discovered.

93.     The activity of the RICO enterprise, Oliver Law, directly impacts both interstate and foreign commerce because Oliver Law has been directly involved in multiple fraudulent build-slot schemes spanning multiple states and countries, including California, Florida, Indiana, Texas, Liechtenstein, Germany, and Italy.

94.     Oliver conducted and participated in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of defrauding Superfast and other victims of the build-slot scheme.

95.     As outlined in the Mente Complaint, the Warrant Affidavit, and above, Oliver has engaged in multiple predicate acts of wire fraud with other victims going back to at least 2021 and with Superfast in 2023.

6112471.2

96.     As explained by Special Agent Luther Selby, the "fraud scheme" starts with the solicitation of money by Oliver and/or his co-conspirators to purchase highly sought after build slots at a significant premium over MSRP.  Ex. 2, Warrant Aff., p. 4, ¶ 11.

97.     Oliver falsely purports to represent the owner of the build slot and provides false documentation to support that representation.  *Id.* at ¶ 12.

98.     For instance, on October 27, 2021, Oliver sent an email from his law firm account to representatives of his target (identified as "Victim 1") located in Indiana, attaching a fabricated license of the purported build-slot seller, Traveon Rogers.  Ex. 2, pp. 6-7, ¶¶ 21.

99.     On October 29, 2021, Oliver sent an email to a representative of Victim 1 in Indiana with multiple fabricated documents.  Ex. 2, p. 8, ¶ 23.

100.    After Special Agent Selby uncovered various fraudulent aspects of the scheme, Oliver and Rogers moved on to "Victim 2". On November 29, 2021, Oliver again used his law firm email account to send a bogus "Asset Transfer Agreement" for a fictitious deal to a representative of Victim 2. Ex. 2, p. 14, ¶ 46.

101.    After Victim 2 became suspicious of the deal, he advised Oliver that Rogers was a "fraud".  Oliver's response was that it was not his business to find out if Rogers was real or not. Ex. 2, p. 15, ¶ 48.

102.    With Rogers becoming known as a fraudster, Oliver and Rogers changed tactics with "Victim 3", which, upon information and belief, may be Mente.  Ex. 2, pp. 15-16, ¶¶ 49-56.

103.    With Mente, Oliver falsely represented that Rogers was a purported exotic car dealer named "Jean-Pierre M.R. Clement", who was represented by Oliver.  Ex. 1, p. 4, ¶ 20.

104.     On December 1, 2021, Oliver sent a bogus purchase agreement to Mente's representative with the fictitious Jean-Pierre M.R. Clement as the seller of the build slot. Ex. 1, p. 5, ¶ 22. The agreement falsely represented that Clement's fictitious company had deposited $606,000.00 with Mercedes-AMG GmbH for the build slot. *Id.*

105.     Based on these and other false representations by Oliver and Rogers, Mente paid more than $5 million to Oliver Law's trust account through multiple separate wire transfers from December 2021 to April 2022.

106.     Oliver's fraudulent build-slot scheme continued into 2023 with a new victim— Superfast. As outlined above, Oliver used WhatsApp and email to send multiple fraudulent documents, including bogus Agreements for both sellers and associated "documentation" of the fictitious sellers.

107.     Upon information and belief, there are other victims of Oliver's fraudulent build-slot scheme.

108.     Oliver's scheme is ongoing in that, to this day, he continues to falsely maintain that the sellers of the Ferrari 812s are "real", refuses to return Superfast's funds, and refuses to disclose what he did with the funds.

109.     As detailed above, Oliver also used wire communications to advance the fraudulent scheme in other ways, such as repeatedly threatening legal consequences by Oliver Law if Superfast communicated directly with Ferrari or went to the authorities.

110.     Oliver intended for this scheme to defraud victims out of as much cash as Oliver could squeeze out of them using the fabricated documents and/or threats of breach of bogus agreements.

111.     Oliver intentionally and knowingly used wire communications (email and WhatsApp) on dozens of occasions to advance the fraudulent build-slot scheme.

112.     Oliver knew his scheme would involve use of interstate and foreign wire communications because he was defrauding victims across the country and overseas.

113.     The acts described above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

114.     As a direct and proximate result of the Oliver's racketeering activities and violations of 18 U.S.C. § 1962(c), Superfast has been injured in its business and property by transferring more than €1.9 million to Oliver Law in reliance on Oliver's fraudulent representations and omissions, which Oliver Law has refused to return.

115.     Superfast is also entitled to treble damages and an award of all costs and attorney fees under applicable law.

### THIRD CLAIM FOR RELIEF
**(C.R.S. § 18-17-104(3) Violation of COCCA Against Oliver)**

116.     Superfast incorporates all foregoing allegations as if set forth fully herein.

117.     Oliver is a person as defined in C.R.S. § 18-17-103(4).

118.     As outlined in Superfast's RICO claim above, Oliver operates Oliver Law, which is a separate legal entity apart from Oliver, as a COCCA enterprise.

119.     Oliver has conducted and participated in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Superfast and several other victims of the build-slot scheme as detailed above.

120.     Specifically Oliver has engaged in multiple predicate acts of wire fraud starting in at least 2021 as alleged with specificity above, including using email and WhatsApp on dozens of

occasions to send fraudulent information and to make demands and threats based on the fraudulent Agreements.

121.     These acts constitute a pattern of racketeering under C.R.S. § 18-17-104(3), which Oliver has knowingly participated in.

122.     As a direct and proximate result of the Oliver's racketeering activities and violations of C.R.S. § 18-17-104(3), Superfast has been injured in its business and property by transferring more than €1.9 million to Oliver Law in reliance on Oliver's fraudulent representations and omissions, which Oliver Law has refused to return.

123.     Superfast is also entitled to preliminary and permanent injunctive relief as a result of Oliver's violations of COCCA as detailed in Superfast's Prayer for Relief below, including a preliminary injunction freezing Oliver's assets and any assets under his control and ordering Oliver to immediately account for Superfast's funds and to whom the funds have been transferred, if anyone.

124.     Superfast is also entitled to treble damages and an award of all costs and attorney fees under applicable law.

### FOURTH CLAIM FOR RELIEF
**(Civil Theft Pursuant to C.R.S. § 18-4-405 Against the Oliver Defendants)**

125.     Superfast incorporates all foregoing allegations as if set forth fully herein.

126.     Superfast had an ownership interest in the €1,956,370.00 wired to Oliver Law.

127.     Oliver, acting individually and on behalf of Oliver Law, knowingly obtained the €1,956,370.00 by fraud and deception as detailed above.

128.     The Oliver Defendants obtained these funds with the intent to permanently deprive Superfast of them.

129.     Despite Superfast's demand, the Oliver Defendants have refused to return the €1,956,370.00.

130.     As a direct and proximate result of the Oliver Defendants' civil theft, Superfast is entitled to an award of damages in an amount to be determined at trial along with treble damages and an award of all costs and attorney fees as mandated by controlling law.

## FIFTH CLAIM FOR RELIEF
### (Conversion Against the Oliver Defendants)

131.     Superfast incorporates all foregoing allegations as if set forth fully herein.

132.     Superfast had an ownership interest in the funds (€1,956,370.00) wired to Oliver Law.

133.     Oliver, acting individually and on behalf of Oliver Law, intentionally and substantially interfered with Superfast's ownership of the funds by obtaining the funds by fraud and deception and by refusing to return the funds on demand.

134.     Superfast did not consent to the Oliver Defendants' theft of the funds.

135.     As a direct and proximate result of the Oliver Defendants' conversion, Superfast is entitled to an award of damages in an amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF
### (Negligent Misrepresentation Against the Oliver Defendants)

136.     Superfast incorporates all foregoing allegations as if set forth fully herein.

137.     The Oliver Defendants provided false information to Superfast in in the course of the Oliver Defendants' business of brokering the sale of purported Ferrari 812 build slots.

138.     The Oliver Defendants provided the information to Superfast to use in connection with Superfast's purchase of the Ferrari 812 build slots.

139.    The false representations are detailed in in the general allegations and in paragraph 74, above, which are incorporated by reference.

140.    The Oliver Defendants were, at a minimum, negligent in communicating false information.

141.    The Oliver Defendants provided false information with the intent that Superfast rely on it in connection with moving forward with the transactions, wiring more than €1.9 million to Oliver Law, and/or delaying in investigating the legitimacy of the bogus transactions.

142.    Superfast's reliance caused injury and damages to Superfast in an amount to be determined at trial.

**SEVENTH CLAIM FOR RELIEF**
**(Unjust Enrichment Against the Oliver Defendants)**

143.    Superfast incorporates all foregoing allegations as if set forth fully herein.

144.    The Oliver Defendants obtained a benefit from the more than €1.9 million transferred to Oliver Law.  Upon information and belief, the Oliver Defendants have used, kept, and/or transferred some or all of those funds for their own benefit.

145.    This benefit was at Superfast's expense because the funds belong to Superfast.

146.    The Oliver Defendants continue to receive the benefit of Superfast's funds under circumstances that would make it unjust for the Oliver Defendants to retain them without paying consideration for the funds, including interest.

147.    The Oliver Defendants' actions have caused and will continue to cause Superfast injury and damages in an amount to be determined at trial.

**PRAYER FOR RELIEF**

Superfast respectfully requests that the Court enter the following relief:

6112471.2

A.      Award Superfast actual, compensatory, consequential, and incidental damages as are shown to have been proximately and directly caused by the acts of the Oliver Defendants;

B.      Award Superfast treble damages as provided by law;

C.      Award Superfast costs and expenses, including reasonable attorneys' fees, incurred in connection with this action in accordance with applicable law;

D.      Award prejudgment, moratory and post-judgment interest under applicable law;

E.      Grant a temporary restraining order and preliminary injunctive relief under COCCA (C.R.S. § 18-17-106(6)), including, without limitation: (1) freezing Oliver's assets and any assets under his control; (2) requiring Oliver to account for Superfast's funds, including identifying to whom he has transferred such funds; and (3) after the accounting, requiring Oliver to deposit into the registry of the Court funds in his possession or control with a value up to €1,956,370 pending the outcome of this proceeding;

F.      Grant permanent injunctive relief under COCCA (CRS 18-17-106(1)), including, without limitation: (1) divesting Oliver of any ill-gotten interest in the enterprise, including any ill-gotten assets held through Oliver Law and (2) precluding Oliver to either directly or indirectly participate in the sale of build slots or similar schemes to prevent others from falling victim to the scam;

G.      Grant a constructive trust over any and all assets held by Oliver that were derived from the fraudulent build-slot scheme against Superfast; and

H.      Grant such other and further relief as this Court deems just and proper.

### **JURY DEMAND**

Superfast demands a trial to a jury on all issues so triable.

24

Dated: September 23, 2025

Respectfully submitted,

*/s/ Kelley B. Duke*
Kelley B. Duke
Benjamin J. Larson
IRELAND STAPLETON PRYOR & PASCOE, PC
1660 Lincoln Street, Suite 3000
Denver, Colorado 80264
Telephone: (303) 623-2700
kduke@irelandstapleton.com
blarson@irelandstapleton.com
**ATTORNEYS FOR PLAINTIFF**

Plaintiff's address:

Industriering 3, 9491 Ruggell, Liechtenstein