# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 1:25-cv-02994-STV

**SUPERFAST GMBH,**

    Plaintiff,

v.

**SCOTT OLIVER; SCOTT OLIVER LAW LLC; AND JOHN DOES 1-10**

    Defendants.

## MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiff Superfast GmbH ("Superfast"), by and through its undersigned counsel, IRELAND STAPLETON PRYOR & PASCOE, PC, and pursuant to Fed. R. Civ. P. 65(a) and (b) and C.R.S. § 18-17-106(6), respectfully files this Motion for Temporary Restraining Order and Preliminary Injunction ("Motion") against Defendants Scott Oliver ("Oliver"), stating as follows:

### **CERTIFICATE OF COMPLIANCE**

In compliance with D.C.COLO.LCivR 7.1, Superfast's undersigned counsel attempted to confer with Oliver's counsel of record in *Michael v. Mente v. Scott Oliver et al.*, No. 1:25-cv-00525 (D. Colo.) by email and phone. His counsel did not respond within 24 hours. In compliance with D.C.COLO.LCivR 65.1, notice of the filing of this Motion was provided to Oliver (through his law firm email account) and by email to his counsel of record in the *Mente* action. Oliver and his counsel were also provided with copies of all Court filings to date in this matter. Oliver was also

personally served with the Summons and Complaint and all filings to date in this matter on September 25, 2025. *See* ECF 8 and 9.

## **INTRODUCTION**

As part of an international wire fraud scheme, Oliver used interstate wire communications to induce Superfast to transfer €1,956,370 (~$2.2 million) to the COLTAF account for Scott Oliver Law LLC ("Oliver Law", and with Oliver, the "Oliver Defendants") to allegedly purchase fabricated "build-slots" for non-existent Ferrari vehicles. Using Oliver Law's purported legitimacy, Oliver created—or at a minimum promoted—fictitious sellers, forged documentation, and induced Superfast to wire funds to overseas accounts under false pretenses.

Oliver has perpetrated the same scheme since at least 2021 and is being pursued in separate federal litigation for a nearly identical $5.4 million scam. Oliver has also been the subject of a federal criminal investigation detailed in an unsealed search warrant affidavit that documented his transfer of $440,000 in stolen funds to known criminal associates. Given Oliver's demonstrated sophistication and willingness to channel assets to co-conspirators—and his outright refusal to return or account for Superfast's funds—immediate asset preservation is critical. Superfast's substantial likelihood of success on its Colorado Organized Crime Control Act ("COCCA") claim becomes meaningless if Oliver dissipates the assets needed to satisfy any judgment.

Accordingly, Superfast seeks a temporary restraining order and preliminary injunction under COCCA to: (1) freeze any assets directly or indirectly under Oliver's control, including any assets held by Oliver Law; (2) forthwith account for assets directly or indirectly under Oliver's Control, including an accounting of Superfast's funds; and (3) require Oliver to deposit into the

2
6112693.2

Court Registry funds in his possession or control with a value of at least €1,956,370 (~$2.2M), pending the outcome of this proceeding.

## FACTUAL BACKGROUND

The factual background supporting this Motion draws substantially from the General Allegations detailed in Superfast's Complaint ("Complaint"). To avoid unnecessary repetition, those facts are summarized here, with the supporting documentation re-attached to this Motion for the Court's convenience.

**The Wire Fraud Scheme**

In early 2023, a man named Marcus Korbach ("Korbach") was working as an exotic car broker in Europe. **Exhibit 1**, Declaration of Marcus Korbach ("Korbach Decl.") ¶ 2. Through a contact within the industry, Claudio Tribolo ("Tribolo"), Korbach was informed of the potential to purchase two Ferrari 812 build slots. *Id.* at ¶ 3. Korbach was aware that Superfast was a buyer of Ferraris and other exotic cars, so he reached out to a representative of Superfast, who indicated Superfast's interest in the transaction. *Id.* at ¶¶ 4-6. Because of language barrier issues, Korbach acted as an intermediary for Superfast. *Id.* at ¶ 9.

Tribolo advised Korbach that the transaction would be handled by an attorney from the United States, by the name of Scott Oliver. *Id.* at ¶ 7. In February and March of 2023, Korbach had several communications with Oliver, who consistently held himself out as an experienced build-slot broker with access to sellers worldwide. Compl. at ¶ 16-17; Ex. 1, Korbach Decl. ¶ 10. The parties primarily communicated electronically through WhatsApp, a private, encrypted messaging platform. Compl. at ¶ 18; Ex. 1, Korbach Decl. ¶ 11.

3

Oliver conditioned the build-slot transactions on Superfast and Korbach executing non-disclosure agreements with Oliver Law, claiming these were necessary to protect the purported sellers' sensitive information and VIP status. Compl. at ¶ 19-24; Ex. 1, Korbach Decl. ¶ 12. This requirement strategically prevented Superfast from independently verifying the legitimacy of the purported sellers or build-slots. Compl. at ¶ 25; Ex. 1, Korbach Decl. ¶ 15. Oliver then provided false documentation for two purported sellers, a Hanamichi Fukoda from Tokyo, Japan and a Jahy Chang from Hong Kong, China. Compl. at ¶ 26-29; Ex. 1, Korbach Decl. ¶ 13; *see, e.g.*, **Exhibit 2**, Fukoda passport.

Relying on these misrepresentations, Superfast executed purchase agreements for each seller and sent two wires to Oliver Law's trust account on March 13, 2023, each in the amount of €751,000.00. Compl. at ¶ 31-33; **Exhibit 3**, Sale and Purchase Agreement with Hanamichi Fukoda; **Exhibit 4**, Sale and Purchase Agreement with Jahy Chang; **Exhibit 5**, wire receipts to Oliver Law. Ten days later, Oliver demanded additional payments using forged Ferrari invoices and receipts of alleged payment by the sellers to Ferrari. Compl. at ¶ 41; **Exhibit 6**, WhatsApp message excerpts ("WhatsApp"), p. 4. When Superfast delayed payment, Oliver sent two letters on Oliver Law's letterhead (directed to Superfast via WhatsApp on March 29, 2023), demanding payment and alleging that Superfast was in breach of contract. Compl. at ¶ 49; Ex. 6, WhatsApp, p. 11; *see* **Exhibit 7**, demand letters. Oliver threatened that the deal would be terminated with all prior payments kept as "liquidated damages" in the event that additional funds were not wired. *Id*. In reliance on the false documentation and in fear of losing the deal and Superfast's money, Superfast made two additional wire payments to Oliver Law's trust account on April 3, 2023, in the amounts of €201,000.00 and €230,370.00, respectively. Compl. at ¶ 50; Ex. 5. While all wires were

4

purportedly made to Oliver Law's trust account, payments were sent to an "IFX Payments" bank account with an overseas London, England address. Compl. at ¶ 51, **Exhibit 8**, Wiring Instructions.

As Korbach and Superfast pressed for proof of the vehicles' existence from June to September 2023, Oliver deflected with increasingly implausible explanations while threatening confidentiality violations to silence their inquiries. Compl. at ¶ 52-54, 58-59, 66. When Korbach indicated Superfast would contact a European Ferrari dealer directly, Oliver escalated his threats, warning that such contact would "risk[] exposing the deal" with Ferrari and result in Superfast losing both the build-slot and all money paid. Compl. at ¶ 55-56; Ex. 1, Korbach Decl. ¶¶ 19-21; Ex. 6, WhatsApp, p. 7. The scheme began unraveling when Korbach threatened to involve "police and lawyers." Compl. at ¶ 62. Oliver inadvertently exposed his deception by sending a message intended for an unidentified co-conspirator in the WhatsApp chain, stating "[t]his is going to be a problem." Compl. at ¶ 63; Ex. 6, WhatsApp, p. 8. In April of this year, when Superfast demanded return of the €1,956,370.00 or an accounting of any transfers, Oliver refused both requests and instead threatened Superfast again with confidentiality violations. Compl. at ¶ 68-69.

**Pattern of Racketeering Activity**

This fraud was not isolated. Oliver has used Oliver Law to orchestrate nearly identical build-slot scams with multiple victims since at least 2021. Compl. at ¶ 5, 30. The Oliver Defendants are currently being sued in federal district court in connection with the fraudulent sale of a Mercedes-Benz AMG One build-slot for $5,417,976.54. Compl. at ¶ 6, Ex. 5, **Exhibit 9**, Complaint, *Michael v. Mente v. Scott Oliver et al.*, No. 1:25-cv-00525 (D. Colo.) ("Mente Complaint"). Additionally, an unsealed federal search warrant application filed in the Southern District of Indiana (and signed under oath by a federal special agent) details the Oliver Defendants'

role in working with a known con-artist to defraud multiple other victims using the same build-slot scam. ("Warrant Affidavit"). Compl. at ¶ 7; **Exhibit 10** ("Warrant Affidavit"). The Warrant Affidavit alleges that Oliver wired $440,000.00 in stolen funds to the con artist to purchase a 2018 Lamborghini Aventador Roadster, evidencing his willingness and capacity to move assets beyond his victims' reach. Compl., Ex.10, ¶¶ 51-53.

Given the international scope of Oliver's racketeering enterprise, the substantial sums involved, Oliver's prior transfer of stolen funds to co-conspirators, and the Oliver Defendants' refusal to account for the €1,956,370 allegedly held in trust, there exists an immediate and substantial risk that Oliver Defendants will funnel the proceeds and other assets outside this Court's jurisdiction to frustrate any judgment or restitution order. Compl. at ¶ 70.

## **LEGAL STANDARD**

TROs and preliminary injunctions are "designed to preserve the status quo or protect rights pending the final determination of a cause." *City of Golden v. Simpson*, 83 P.3d 87, 96 (Colo. 2004). This Court has considerable discretion in granting injunctive relief, and such determinations are rarely disturbed on appeal. *Rathke v. MacFarlane*, 648 P.2d 648, 654 (Colo. 1982). While a temporary restraining order may be issued without notice to the defendant, that issue is not a factor here because the Oliver Defendants have been notified of this Motion.

Because a temporary restraining order is only a short-term order, a party is entitled to preliminary injunctive relief for the duration of the case upon demonstrating: (1) a reasonable probability of success on the merits of the claims for which it seeks injunctive relief; (2) a danger of real, immediate, and irreparable injury that may be prevented by injunctive relief; (3) the absence of a plain, speedy, and adequate remedy at law; (4) that the granting of a preliminary

injunction will not disserve the public interest; (5) that the balance of the equities favors the injunction; and (6) that the injunction will preserve the status quo pending a trial on the merits. *Simpson*, 83 P.3d at 96. As outlined below, however, under COCCA, a plaintiff does not need to show irreparable harm to obtain injunctive relief.

**ARGUMENT**

1. **The Court Has Authority Under COCCA to Grant Pre-Judgment Injunctive Relief to Prevent the Dissipation of Assets.**

"An explicit legislative purpose underlying COCCA was to expand traditional 'sanctions and remedies ... [which] are unnecessarily limited in scope and impact.'" *FDIC v. Antonio*, 843 F.2d 1311, 1312-13 (10th Cir. 1988) (citing C.R.S. § 18–17–102). Consequently, section 18-17-106(6) of COCCA empowers a plaintiff to seek injunctive relief in conformity with the principles governing other civil cases, except that "<u>no showing of special or irreparable damage to the person shall have to be made</u>." (Emphasis added).

The Tenth Circuit has recognized that COCCA's broad remedial purpose gives courts wide discretion to grant pre-judgment relief to prevent the dissipation of assets, including the power "to freeze assets which are <u>not</u> traceable to illegal conduct" to ensure plaintiffs can recover the full treble damages provided under Section 18-17-106(7). *Antonio*, 843 F.2d at 1312-13 (finding that "courts may need to ensure the post-judgment availability of assets not related to the illegal conduct" to provide meaningful recovery for wronged plaintiffs) (emphasis added); *see also Nat'l Union Fire Ins. Co. of Pitts v. Kozeny*, 115 F. Supp. 2d 1231, 1239 (D. Colo. 2000) (granting plaintiffs' motion for preliminary injunction pursuant to COCCA § 18-17-106(1) and (6)).

6112693.2

### 2. Superfast Satisfies All Requirements for Preliminary Injunctive Relief.

#### a. <u>Superfast Has a Substantial Likelihood of Success on Its COCCA Claim.</u>

In evaluating the appropriateness of preliminary injunctive relief, the reasonable probability of success factor requires the Court to substantively evaluate the merits of the claims asserted by the moving party. *Dallman v. Ritter*, 225 P.3d 610, 621 (Colo. 2010). Because Superfast seeks injunctive relief under COCCA, it needs only to establish a substantial likelihood of success on that claim.

Section 18-17-104(3) of COCCA provides, in relevant part, "[i]t is unlawful for any person employed by, or associated with, any enterprise to knowingly conduct or participate, directly or indirectly, in such enterprise through a pattern of racketeering activity or the collection of an unlawful debt." Based on the detailed factual allegations in the Complaint and the evidence attached to this Motion, Superfast has a substantial likelihood of success on its COCCA claim because Oliver has used Oliver Law as a COCCA enterprise to perpetrate the same build-slot scam on multiple victims. Each COCCA element is addressed in turn.

First, Oliver is a "person" because he is an "individual . . . holding or capable of holding a legal or beneficial interest in property." C.R.S. § 18-17-103(4).

Second, Oliver is undeniably "associated" with Oliver law, which is a separate legal entity and thus satisfies the "enterprise" definition under COCCA. C.R.S. § 18-17-103(2). When interpreting the same element under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the U.S. Supreme Court has held that the "enterprise" element is satisfied where an owner of a company uses the company to conduct racketeering activities. *Cedric Kushner Promotions v. King,* 533 U.S. 158, 165-166 (2001). In this case, the Mente case, and with the

victims discussed in the Warrant Affidavit, Oliver has used and relied on the apparent legitimacy of Oliver Law to perpetuate the scheme, including using Oliver Law's COLTAF account to route stolen funds. Ex. 5, Mente Compl., p. 5, ¶¶ 27-28; Ex. 10, Warrant Aff., p. 15, ¶¶ 25, 50-53, 65 (identifying "SCOTT OLIVER LAW COLTAF" as the account used by Oliver).

Additionally, Oliver used his law firm in other ways to advance the same scheme on multiple victims, including preparing letters of intent on firm letterhead (Ex. 10, p. 13, ¶ 40) and using his law firm email account to send fraudulent documents and agreements (Ex. 10, p. 14, ¶ 46). In this case, Oliver Law was the party to the NDAs that were the precursor to the bogus Agreements. **Exhibit 11**, Korbach NDA, p. 5. Oliver also used the apparent legitimacy of his law firm to make monetary demands for alleged breaches of the bogus Agreements, which ultimately resulted in Superfast wiring another €431,370 to Oliver Law's trust account. Ex. 7, demand letters; **Exhibit 12**, wire payments.

Third, the "pattern of racketeering activity" element is satisfied if Oliver knowingly engaged in at least two acts of racketeering activity (separated by not more than ten years) related to the conduct of the enterprise. C.R.S. § 18-17-103(3). "Racketeering activity" includes the commission, attempted commission, or conspiracy to commit, *inter alia*, an offense indictable under 18 U.S.C. § 1343 (wire fraud). C.R.S. § 18-17-103(5) (incorporating by reference 18 U.S.C. § 1961). A person commits wire fraud if he devises a scheme or artifice to obtain money by means of false or fraudulent pretenses, representations, or promises, and transmits by means of wire communication in interstate commerce any writings or sounds for the purpose of executing the scheme. *See* 18 U.S.C. § 1343.

Here, the Oliver Defendants engaged in multiple acts of wire fraud across multiple states and countries spanning years and involving millions of dollars. As outlined in the Mente Complaint, the Warrant Affidavit, and Superfast's Complaint, Oliver has extensively used wire communications and bank wires to defraud multiple victims going back to at least 2021. *See United States v. Avenatti*, No. 19-cr-374, 2022 WL 305145, at *14 (S.D.N.Y. Feb. 1, 2022) (recognizing emails, WhatsApp messages, and bank wires as interstate wires).

As explained by Special Agent Luther Selby, the "fraud scheme" starts with the solicitation of money by Oliver and/or his co-conspirators to purchase highly sought after build slots at a significant premium over MSRP. Ex. 10, Warrant Aff., p. 4, ¶ 11. Oliver falsely purports to represent the owner of the build slot and provides false documentation to support that representation. *Id.* at ¶ 12. For instance, on October 27, 2021, Oliver sent an email from his law firm account to representatives of his target (identified as "Victim 1") located in Indiana, attaching a fabricated license of the purported build-slot seller, Traveon Rogers. Ex. 10, pp. 6-7, ¶¶ 21. On October 29, 2021, Oliver sent an email to a representative of Victim 1 in Indiana with multiple fabricated documents. Ex. 10, p. 8, ¶ 23. After Special Agent Selby uncovered various fraudulent aspects of the scheme, Oliver and Rogers moved on to "Victim 2". On November 29, 2021, Oliver again used his law firm email account to send a bogus "Asset Transfer Agreement" for a fictitious deal to a representative of Victim 2. Ex. 10, p. 14, ¶ 46. After Victim 2 became suspicious of the deal, he advised Oliver that Rogers was a "fraud". Oliver's response was that it was not his business to find out if Rogers was real or not. Ex. 10, p. 15, ¶ 48.

With Rogers becoming known as a fraudster, Oliver and Rogers changed tactics with "Victim 3". Ex. 10, pp. 15-16, ¶¶ 49-56. With Victim 3, Oliver falsely represented that Rogers

10

was a purported exotic car dealer named "Jean-Pierre M.R. Clement", who was represented by Oliver. Ex. 9, p. 4, ¶ 20. On December 1, 2021, Oliver sent a bogus purchase agreement to Mente's representative with the fictitious Jean-Pierre M.R. Clement as the seller of the build slot. Ex. 9, p. 5, ¶ 22. The agreement falsely represented that Clement's fictitious company had deposited $606,000.00 with Mercedes-AMG GmbH for the build slot. *Id.* Based on these and other false representations by Oliver and Rogers, Victim 3 wired more than $1.3 million to Oliver Law's trust account through multiple separate wire transfers in 2021. Ex. 10, Warrant Aff. ¶ 50.

In the case of Superfast, Oliver sent hundreds of communications via WhatsApp and email to defraud Superfast into wiring more than $2 million into Oliver Law's trust account for two separate purported build-slot transactions. Compl. ¶¶ 15-70; *see generally* Ex. 5; Ex. 6; Ex. 12, bank wires. Accordingly, Superfast's COCCA claim is highly likely to succeed. At this point, Oliver cannot legitimately deny that the Ferraris purportedly purchased by Superfast do not exist and that Superfast is just one of many victims of a blatant fraud scheme.

      b. <u>Superfast Does Not Need to Show the Danger of Irreparable Injury Under COCCA.</u>

Superfast is not required to show irreparable injury under COCCA. C.R.S. § 18-17-106(6).

      c. <u>Plaintiff Does Not Have a Plain, Speedy, and Adequate Remedy at Law.</u>

This requirement is satisfied where, as here, the Oliver Defendants have shown a propensity to dissipate assets beyond the reach of the Court. *Kozeny*, 115 F. Supp. 2d at 1239 (D. Colo. 2000); *see also SEC v. Universal Consulting Res., LLC*, No. 10-cv-027940-JLK-KLM, 2010 U.S. Dist. LEXIS 128469, at *6 (D. Colo. Nov. 23, 2010). As detailed in the Search Warrant Affidavit, Oliver has wired millions of dollars of victims' money to known co-conspirators. Ex. 10, Search Warrant Aff. ¶¶ 51-53. The Oliver Defendants' refusal to return or account for the

€1,956,370, combined with their multi-jurisdictional operation, demonstrates that a judgment would likely be uncollectible without immediate asset preservation.

    d. <u>The Public Interest Is Best Served by an Injunction.</u>

The public interest strongly favors preventing continued fraud and ensuring accountability for racketeering activity. Notably, Oliver embarked on his scam with Superfast after defrauding multiple other victims and after he was already under federal investigation and being confronted with the scam in the Mente Case. He has already demonstrated an intent to dissipate assets within his network of co-conspirators. Compl. at ¶ 7. By ensuring judgments can be satisfied, asset preservation serves the judicial process in providing meaningful remedies to injured plaintiffs and has been expressly recognized as an effective tool available under COCCA.

    e. <u>Equity Favors an Injunction.</u>

Superfast has lost the equivalent of approximately $2.1 million through documented fraud and will be permanently harmed if the Oliver Defendants move assets beyond this Court's reach. Any inconvenience Oliver faces from temporarily frozen assets is minimal compared to Superfast's total loss. The Court can also tailor the injunctive relief to minimize the impact on Oliver while this case is pending, including permitting Oliver to pay for living expenses in the ordinary course.

    f. <u>An Injunction Will Preserves the Status Quo.</u>

The purpose of a preliminary injunction is to preserve the status quo pending resolution of the merits of a claim. *Home Shopping Club, Inc. v. Roberts Broadcasting Co. of Denver*, 961 P.2d 558, 560 (Colo. App. 1998). The relevant status quo encompasses the parties' financial positions before the Oliver commenced dissipating or concealing assets to evade potential liability. This

factor strongly favors the issuance of a temporary restraining order and preliminary injunction. Asset preservation maintains this status quo by preventing Oliver from further eroding the ability to satisfy a judgment. The injunctive relief can be narrowly tailored to preserve the status quo. Absent an injunction, Oliver can continue moving assets beyond this Court's reach, materially prejudicing Superfast's ability to be restored to its former position even upon a favorable final resolution of this action.

### 3. Superfast Is Prepared to Post a Bond as Ordered by the Court.

Both Fed. R. Civ. P. 65(c) and COCCA require the Court to set a bond to protect against potential damage to Oliver in the event injunctive relief was wrongly granted. C.R.S. § 18-17-106(6). Because Superfast only seeks to temporarily freeze Oliver's assets (while allowing him to continue to cover daily living expenses) and force him to tender to the Court Registry the amount Superfast wired to his trust account, Oliver has little "damages" exposure if it turns out the injunctive relief was wrongly granted. In that case, Oliver would continue to retain his previously frozen assets and any funds deposited with the Court Registry would be returned to Oliver. Arguably, the damages under this scenario would potentially be reduced interest income on funds deposited into the Court Registry (which funds are in an interest-bearing account through the Court Registry Investment System) and reduced interest income on any assets held by Oliver that were not already in interest bearing holdings. It is difficult to determine any such theoretical damages prior to Oliver accounting for his assets. However, because Oliver has been put on notice of this Motion, he will have an opportunity to argue a proper bond amount even at the TRO stage.

Superfast respectfully submits that $150,000 represents adequate security to protect Oliver against any theoretical harm he might suffer if injunctive relief was wrongly granted. This amount

13
6112693.2

would cover more than one year of potential interest Oliver could earn at a market rate of 6% on the ~$2.2 million in funds Superfast wired to Oliver's trust account. Superfast is ready and willing to immediately tender a $150,000 cash bond to the Court Registry upon the Court's order. The Court can also revisit the bond amount after an accounting of Oliver's assets, which will inform the theoretical damages he may incur if injunctive relief was wrongly granted.

## **CONCLUSION**

WHEREFORE, Superfast respectfully requests that the Court:[1]

A. Except for ordinary course daily living expenses, grant a temporary restraining order and preliminary injunctive relief under COCCA (C.R.S. § 18-17-106(6)) for the pendency of this action, restraining and enjoining Oliver from directly or indirectly:

1. Transferring, liquidating, converting, encumbering, pledging, loaning, selling, concealing, dissipating, disbursing, assigning, spending, withdrawing, granting a lien or security interest or other interest in, or otherwise disposing of any funds, real or personal property, accounts, contracts, or any other assets, or any interest therein, wherever located, including outside the United States, that are (a) owned or controlled, directly or indirectly, by Oliver, in whole or in part, or held, in whole or in part for the benefit of Oliver; (b) in the actual or constructive possession of Oliver; or (c) owned, controlled by, or in the actual or constructive possession of any corporation, partnership, or other entity directly or indirectly owned, managed, or controlled by, Oliver, including without limitation, Oliver Law, and any assets held

---

[1] Superfast requests that the Court temporarily order categories of relief A-C pending as part of the TRO and pending the preliminary injunction hearing.

by, for, or under the name of Oliver at any bank or savings and loan institution or with any broker-dealer, escrow agent, title company, commodity trading company, precious metal dealer, or other financial institution or depository of any kind;

2. Opening or causing to be opened any safe deposit boxes titled in the name of any Oliver or subject to access by Oliver;

3. Incurring charges or cash advances on any credit card, debit card, or checking card issued in the name of Defendant, singly or jointly, except for ordinary course daily living expenses;

4. Obtaining a personal or secured loan;

5. Incurring liens or encumbrances on real property, personal property or other assets in the name, singly or jointly, of Oliver; and

6. Cashing any checks from clients or customers of Oliver or Oliver law.

B. Require Oliver to obtain Court prior approval for any proposed financial transactions that are not ordinary course living expenses.

C. Order Oliver to forthwith account for all assets set forth in sub-section A.1 above, including without limitation, accounting for Superfast's funds that were purportedly wired to Oliver Law's COLTAF account and identifying to whom he has transferred any such funds;

D. Based on Oliver's accounting of such assets, issue Order(s) to those banks, savings and loan institutions, broker-dealer, escrow agent, title company, commodity trading company, precious metal dealer, or other financial institution holding assets directly or indirectly controlled by Oliver, as appropriate;

6112693.2

E. Based on Oliver's accounting of such assets, require Oliver to deposit into the Court Registry funds with a value of at least €1,956,370 (~$2.2M), which is the amount Superfast wired to Oliver Law, pending the outcome of this proceeding to be available to satisfy a portion of any judgment in this case;

F. Accept and approve of the proposed cash bond in the amount of $150,000, which Superfast will immediately tender to the Court Registry; and

G. Grant Superfast such other and further relief as this Court deems just and proper.

For the Court's convenience, a proposed temporary restraining order and order for preliminary junction are filed herewith.

Dated: September 26, 2025

Respectfully submitted,

*/s/ Kelley B. Duke*
Kelley B. Duke
Benjamin J. Larson
IRELAND STAPLETON PRYOR & PASCOE, PC
1660 Lincoln Street, Suite 3000
Denver, Colorado 80264
Telephone: (303) 623-2700
kduke@irelandstapleton.com
blarson@irelandstapleton.com
**ATTORNEYS FOR PLAINTIFF**

# CERTIFICATE OF SERVICE

I hereby certify that on September 26, 2025, the foregoing **MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** was electronically filed with the Court using the CM/ECF system, and served on Defendants as follows:

Via Email:
Scott Oliver
Scott Oliver Law LLC
Email: scott@scottoliverlaw.com

Via Email:
Bolor Nyamaa, Esq.
LEWIS BRISBOIS BISGAARD & SMITH LLP
Email: Bolor.Nyamaa@lewisbrisbois.com
*Attorney for Scott Oliver and Scott Oliver Law, LLC*

                                            */s/ Kelley B. Duke*
                                            Kelley B. Duke